Arnold LYNN, Petitioner–Appellee,

v.

Dennis BLIDEN, First Deputy Supt., Respondent–Appellant.

No. 04–6280 PR.

United States Court of Appeals, Second Circuit.

Argued: Sept. 12, 2005.

Decided: March 30, 2006.

As Amended May 19, 2006.

Susan M. Damplo, Attorney at Law, Ardsley, N.Y., for Petitioner–Appellee.

Stanley R. Kaplan, Assistant District Attorney, Bronx County (Joseph N. Ferdenzi, Assistant District Attorney, on the brief; Robert T. Johnson, District Attorney, Bronx County), Bronx, N.Y., for Respondent–Appellant.

Before: MINER, RAGGI, Circuit Judges, and KARAS, District Judge.*

MINER, Circuit Judge.

The question presented here is whether the District Court improperly concluded under AEDPA review that the state court's application of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), was objectively unreasonable for having rejected a Sixth Amendment challenge based on various alleged failures of trial counsel.

Respondent-appellant First Deputy Superintendent Dennis Bliden (hereinafter the "State") appeals from a judgment entered September 28, 2004, in the United States District Court for the Southern District of New York (Wood, *J.*) granting the application of the petitioner-appellee Arnold Lynn ("Lynn" or "Petitioner") for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Lynn was convicted for Murder in the Second Degree, pursuant to N.Y. Penal Law § 125.25(1), and Attempted Murder in the Second Degree, pursuant to N.Y. Penal Law §§ 110.00, 125.25(1), in the Supreme Court of the State of New York, Bronx County (Collins, *Justice*). Lynn is serving concurrent indeterminate terms of imprisonment of twenty years to life and six years to twelve years, respectively. At the time of the commencement of this action, Bliden was the acting First Deputy Superintendent of the Green Haven Correctional Facility, the prison where Lynn is confined.

The District Court found that the state court's application of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), was objectively unreasonable, the state court having rejected Lynn's Sixth Amendment challenge based on trial counsel's failure (a) to move to reopen a *Wade* hearing after learning that one eyewitness had failed to identify the Petitioner when first shown a photo array; (b) to cross-examine another eyewitness about a previous statement in which the eyewitness claimed that he "couldn't recognize" the culprit; and (c) to successfully argue for admission, under New York's business records exception to the hearsay rule, of those portions of a police report containing the reporting officer's own observations.

For the reasons that follow, we hold that the state court's application of clearly established federal law, as determined by the United States Supreme Court, was objectively reasonable in this case, and, accordingly, that the application for a writ of habeas corpus should have been denied.

---

* The Honorable Kenneth M. Karas, United States District Court for the Southern District of New York, sitting by designation.

## BACKGROUND

At approximately 5:30 p.m. on February 7, 1992, two men approached Jermaine Seippio ("Seippio") and Kendrick Chandler ("Chandler") outside of their residence at 115 Marcy Place in the Bronx. One of the approaching men argued loudly with Seippio and Chandler. Seippio questioned this man: "[H]ow can you tell me I cannot sell my drugs around here. Who [ ] do you think you are?" After a pushing contest with Seippio, the man removed a gun from his coat and fired what sounded like three shots at Seippio and Chandler. The shooter and his companion ran off. Chandler fell dead. Seippio, with the help of a neighbor who was present at the scene, Toby Patterson ("Patterson"), limped inside 115 Marcy Place. Seippio later was hospitalized. Luis Quinones ("Quinones"), a resident of the neighborhood, observed the shooting from his mother's apartment at 108 Marcy Place.

At approximately 5:45 p.m., Detective William Martinez arrived at the scene and observed a large crowd standing around Chandler's body. Pedro Arriaga ("Arriaga") soon was arrested as the shooter, apparently based on statements made to the police by two bystanders who claimed to be eyewitnesses. Arriaga was apprehended and arrested by Detective Beers after being assaulted by a crowd and then trying to hide under a car a block or two away from Marcy Place. Detective Beers "pulled [Arriaga] out from under the rear of the car, while [Arriaga was] being assaulted by the crowd."

Neither Patterson nor Quinones initially told the police what he had observed. Patterson was interviewed several times by the police but said that he was initially "too scared" to come forward with the information until September of 1992. Quinones said that he did not want to "get involved" because he feared for the safety of his family. Quinones originally lied to the police about witnessing the crime and told Detective Martinez on February 20, 1992, that he could not recognize the shooter.

While Arriaga's case was pending before the grand jury, Quinones told a friend of his, who was also a friend of Arriaga, that Arriaga was innocent. That mutual friend, Mark Falu ("Falu"), implored Quinones to report what he saw to the police. It appears that Falu's brother had been arrested at about the same time as Arriaga. At first, Quinones refused to go to the police. It was not until Arriaga's mother visited Quinones, at which time he saw that she was "suffering," that Quinones agreed to contact Arriaga's lawyer. Quinones also spoke with an assistant district attorney and Detective Martinez. The police reopened the investigation and re-interviewed several witnesses.[1] On motion by the People on September 14, 1992, the charges against Arriaga were dismissed.[2]

On September 16, 1992, Detective Martinez held a recorded meeting with Patterson in a police car, where he showed Pat-

---

1. Several times prior to trial, Detective Martinez went to Seippio's apartment, spoke with Seippio's mother, and gave her a number of subpoenas for her son to appear in court. Ms. Seippio claimed not to know the whereabouts of her son, but indicated that he might have left the State.

2. Assistant District Attorney Thomas Chifolo prosecuted the case against Arriaga and stated in an affirmation that the two witnesses, Leonard Spaulding and Lazaro McBeatch, who had "testified before the grand jury concerning the death" of Chandler, "initially testified that Pedro Arriaga was the man who shot ... Chander." These two witnesses, according to Chifolo, later recanted their testimony when re-interviewed and stated that Arriaga was not the man who shot Chandler.

terson an array of six photographs, one of which was of Lynn. Patterson identified Lynn as the shooter, and Lynn was arrested two days later.

Approximately one week after Detective Martinez showed Patterson the photo array in the police car, Detective Martinez showed Quinones the same photo array that he showed Patterson, and Quinones also identified Lynn as the shooter. On September 24, 1992, Patterson and Quinones separately viewed lineups at the Bronx County District Attorney's Office. Each identified Lynn as the shooter.

By Indictment filed on October 8, 1992, the Bronx County Grand Jury charged Lynn with various crimes, including Murder in the Second Degree and Attempted Murder in the Second Degree. Following the Indictment, Lynn's trial attorney, Arthur F.X. Henriksen ("Henriksen"), filed a pre-trial motion to suppress the identifications made by Patterson and Quinones. On February 8, 1995, the trial court judge, the Honorable John P. Collins, Supreme Court of New York, 12th Judicial District (Bronx County), conducted a *Wade* hearing. *See United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). At that hearing Detective Martinez testified, inter alia, about the circumstances surrounding the presentation of the photo array to Patterson on September 16, 1992, and to Quinones about a week later, as well as the procedure followed during the subsequent line-ups on September 24 of that year. The trial judge determined that all of the police procedures were prop-

er and that the identifications were admissible.

A trial jury was selected on February 16, 1995. On Friday, February 17, not a scheduled trial day, the Assistant District Attorney ("ADA") spoke to Patterson and reviewed some police reports in preparation for trial. It was then that the prosecutor discovered that Patterson had been shown the photo array on two separate occasions. The first time that Patterson had been shown a photo array—about a week before the September 16 photo array—Patterson had not identified Lynn. Detective Martinez testified only about the second photo array at the *Wade* hearing.[3] The ADA immediately contacted Henriksen by telephone.

On February 21, before the jury was called into the courtroom, the ADA informed Justice Collins about the earlier photo array and stated that he had only learned of it on February 17. The ADA stated that, upon learning of the earlier array, he had questioned Patterson about it. According to the ADA, Patterson responded that he had recognized Lynn as the shooter "in his own mind" when he first saw the photo array but did not identify Lynn to the police at that time because "he was too afraid to say who did it." Henriksen said nothing to the trial judge regarding the identifications or the *Wade* hearing.[4] Opening statements began later that day.

At trial, no physical evidence was offered that linked Lynn to the shootings. The only evidence that implicated Lynn

---

3. The Record is not clear as to who showed Patterson the photo array for the first time. The *Magistrate Judge* stated only that "although Martinez had not made a written report of [the] earlier meeting with Patterson, another detective had made such a report and it established that Patterson had been shown the photo array one week before the Septem-

ber 16th identification about which Martinez testified."

4. Lynn claims that Henriksen "simply moved on to the next issue at hand involving the trial court's pending *Sandoval* ruling." The Record does not entirely bear this out as it appears that the trial judge moved the discussion on to the *Sandoval* ruling.

consisted of the eyewitness accounts of Patterson and Quinones, both of whom made courtroom identifications of Lynn as the shooter. The police never were able to locate Seippio, and he did not testify at the trial. The doctor who performed surgery on Seippio after the shooting did, however, testify that Seippio sustained gunshot wounds to his chest and back and that Seippio would have died had he not received immediate medical treatment.

The ADA explained to the jury during his opening statement that Arriaga initially had been arrested and charged with the shootings but that Arriaga was released because the charges against him were unfounded. The State also presented evidence of Arriaga's initial arrest and subsequent release by way of the testimony of Detective Martinez. Henriksen cross-examined Detective Martinez, as well as Patterson and Quinones, but the defense presented no case of its own.

On March 1, 1995, the jury convicted Lynn of murder in the second degree and attempted murder in the second degree. Judgment of conviction was rendered March 27, 1995. Lynn was sentenced to an indeterminate term of incarceration of twenty years to life on the murder count and six-to-twelve years on the attempted murder count. Lynn is serving the sentences concurrently.

Lynn appealed his conviction. On appeal, Lynn argued to the Supreme Court of the State of New York, Appellate Division, First Department ("Appellate Division"), that Henriksen [5] was ineffective for: (1) failing to move to reopen the *Wade* hearing; (2) failing to cross-examine Quinones about his statement to Detective Martinez shortly after the crime that "he couldn't recognize the person" who committed the crime; and (3) failing to properly argue for the admissibility of a portion of Detective Beers' police report to show that, at the time of the shooting, Arriaga was pulled out from under a car after being assaulted by a crowd at the scene.

The Appellate Division affirmed Lynn's conviction on June 25, 1998. See People v. Lynn, 251 A.D.2d 250, 673 N.Y.S.2d 913 (1st Dep't 1998) (memorandum decision). That decision reads in relevant part:

> The existing record, which defendant has not sought to amplify by way of a [Crim. Proc. Law § ] 440.10 motion whereby counsel's strategic decisions could have been explored (*see* [ ] *People v. Love*, 57 N.Y.2d 998, 457 N.Y.S.2d 238, 443 N.E.2d 486), fails to support defendant's claim of ineffective assistance. Counsel made appropriate pretrial and trial motions and applications, vigorously cross-examined the People's witnesses, and delivered a cogent summation. Defendant has not demonstrated that he was deprived of effective assistance by counsel's failure to seek a reopened suppression hearing based on the People's disclosure at the start of trial, since defendant has not shown that the hearing would have been reopened, or that a reopened hearing would have resulted in suppression of any evidence. Likewise, defendant has not shown that counsel's purported omissions with respect to cross-examination of one of the identifying witnesses, and introduction of documentary evidence affected the outcome of the trial.

*Id.* at 250–51, 673 N.Y.S.2d 913 (citation omitted).

On December 2, 1998, the New York Court of Appeals denied Lynn's request for leave to appeal. *See People v. Lynn,*

---

**5.** According to the records of the Assigned Counsel Plan of the Appellate Division, First Department, Henriksen passed away in July of 1997.

92 N.Y.2d 1035, 684 N.Y.S.2d 500, 707 N.E.2d 455 (1998) (memorandum decision).

On June 24, 1998, Lynn moved, pro se, in New York Supreme Court, Bronx County, pursuant to N.Y.Crim. Proc. Law § 440.10, to vacate his conviction, alleging that counsel was ineffective for failing to investigate his claim that he was misidentified and to call two witness who could have testified that someone other than Lynn had been the shooter. On January 21, 1999, that motion was denied on procedural grounds as untimely and as having been previously determined on the merits in Lynn's direct appeal. On July 7, 1999, Lynn's motion for reargument of his § 440.10 motion was denied. On October 20, 1999, the Appellate Division denied Lynn leave to appeal the order denying his § 440.10 motion.

On May 22, 2000, Lynn filed a habeas petition in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 2254, raising the same claims of ineffective assistance of counsel raised in his direct appeal and in his N.Y.Crim. Proc. Law § 440.10 motion. District Magistrate Judge Theodore H. Katz, to whom the case was referred for a Report and Recommendation, ruled that only those claims raised on direct appeal were not subject to procedural bars. That ruling is not challenged.

In his Report and Recommendation, dated April 26, 2004, the Magistrate Judge found the essential issue to be "whether [the Appellate Division's] decision involved an 'unreasonable application' of the *Strickland* standard to the facts of [Lynn's] case." The Magistrate Judge found that the state court ruling was not an objectively unreasonable application of the standard. In recommending that the petition be denied as to the claim of failure to reopen the *Wade* hearing, the Magistrate Judge did not "dwell on whether [Lynn]

can satisfy the first prong of the *Strickland* test" since Lynn could not "satisfy the second prong of the *Strickland* test" in that he

has not alleged, [much] less demonstrated, that in the time between Patterson's first and second viewing of the photo array, [that] there was anything [that] the police did [that] was suggestive.... [T]here is no basis to conclude that had the *Wade* hearing been reopened, Patterson's identification of [Lynn] would have been suppressed or, more pertinently, that the outcome of his trial would have been different. Because [Lynn] cannot demonstrate that it is likely that the outcome of his trial would have been different had the *Wade* hearing been reopened, his claim of ineffective assistance must fail.

With regard to the issue of Henrikson's alleged ineffective cross-examination of Quinones, the Magistrate Judge determined that Henriksen "did establish and argue ... that Quinones had originally denied knowing anything about the shooting" and that his questions to Quinones about Mark Falu, whose brother was arrested with Arriaga, "were not pointless." Finally, regarding the issue of Henrikson's failure to have portions of the police report received into evidence, the Magistrate Judge ruled that "[t]here may have been strategic reasons" why Henriksen chose not to press to have admissible portions of a police report received into evidence but that Lynn could not prove prejudice from this failure "[i]n any event." Therefore, the Magistrate Judge concluded that Lynn was not denied the effective assistance of counsel and recommended to the District Court that the petition be denied.

In an Order dated September 23, 2004, the District Court (Wood, *J.*), although adopting the Magistrate Judge's factual findings in large measure, disagreed with

the Magistrate Judge's conclusions and granted the habeas petition. The court observed that none of Henriksen's challenged omissions at trial could be attributed to a "sound" trial strategy.[6] The District Court found that these errors of omission were prejudicial and that, taken together, they "seriously undermine[d]" confidence in the outcome. Therefore, the District Court concluded that the Appellate Division's rejection of Lynn's ineffective assistance of counsel claim was objectively unreasonable and granted the petition.

The State now appeals the judgment entered by the District Court granting Lynn's petition for habeas corpus.

## ANALYSIS

### I. Review Under AEDPA

■ This Court reviews the District Court's grant of habeas relief de novo. *See, e.g., McMahon v. Hodges,* 382 F.3d 284, 288 (2d Cir.2004); *Noble v. Kelly,* 246 F.3d 93, 98 (2d Cir.2001). Lynn filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), so the "standard for review by a district court in the first instance has been established by ... [AEDPA], as codified in 28 U.S.C. § 2254(d)." *Torres v. Berbary,* 340 F.3d 63, 67–68 (2d Cir.2003); *see also Vasquez v. Strack,* 228 F.3d 143, 147 (2d Cir.2000).

Under AEDPA, a federal court may grant a petition for habeas corpus notwithstanding a contrary state court adjudication on the merits, in accordance with the following provisions:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

■ Assuming that a claim is not procedurally barred,

> [w]ith respect to the elements of AEDPA deferential review set forth in § 2254(d)(1), a state court's decision is "contrary to" clearly established Supreme Court precedent if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."

*Torres,* 340 F.3d at 68 (quoting *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)) (alteration in original). "[A]n [objectively] 'unreasonable application' of 'clearly established' Supreme Court precedent occurs when a state court 'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams,* 529 U.S. at 413, 120 S.Ct. 1495) (second alteration in original).

---

**6.** The District Court also noted the difficulty of developing a factual record in light of Henriksen's untimely death.

■ "Although it is clear that the question is 'whether the state court's application of clearly established federal law was objectively unreasonable,' the precise method for distinguishing 'objectively unreasonable' decisions from merely erroneous ones is less clear." *Cotto v. Herbert,* 331 F.3d 217, 248 (2d Cir.2003) (citation omitted); *see also Gilchrist v. O'Keefe,* 260 F.3d 87, 93 (2d Cir.2001). "However, it is well-established in [this] [C]ircuit that the objectively unreasonable standard of § 2254(d)(1) means that [a] petitioner must identify some *increment of incorrectness* beyond error in order to obtain habeas relief." *Cotto,* 331 F.3d at 248 (internal quotation marks omitted). In *Lainfiesta v. Artuz,* 253 F.3d 151 (2d Cir.2001), this Court, relying principally on *Williams,* explained:

A state court decision falls within the unreasonable application clause if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case. The Supreme Court has thus far offered little guidance as to the meaning of the term unreasonable application, tautologically instructing federal habeas courts to ask whether the state court's application was objectively unreasonable.

The Supreme Court did caution, however, that an unreasonable application of federal law is different from an incorrect or erroneous application of federal law. Thus, a federal habeas court is not empowered to grant the writ when, in its independent judgment, it determines that the state court incorrectly applied the relevant federal law. The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable. However, the increment need not be great; otherwise, habeas relief would be

limited to state court decisions so far off the mark as to suggest judicial incompetence.

253 F.3d at 155 (internal quotation marks and citations omitted; alterations in original).

■ This standard of review applies whenever the state court has adjudicated the federal claim on the merits, regardless of whether the court has alluded to federal law in its decision. As this Court stated in *Sellan v. Kuhlman,* 261 F.3d 303 (2d Cir. 2001):

For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

261 F.3d at 312; *see also Jones v. Stinson,* 229 F.3d 112, 119–21 (2d Cir.2000) (reversing the grant of habeas corpus because, though the state court's decision was questionable, it was not objectively unreasonable).

In addition, a state court's determination of a factual issue is presumed to be correct, and is unreasonable only where the petitioner meets the burden of "rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Parsad v. Greiner,* 337 F.3d 175, 181 (2d Cir.2003); *Mask v. McGinnis,* 233 F.3d 132, 139 (2d Cir.2000). Moreover, a state court's findings of fact "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court

proceeding." *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

## II. *Ineffective Assistance of Counsel*

An ineffective assistance claim asserted in a habeas petition is analyzed under the "unreasonable application" clause of AEDPA because it is "past question that the rule set forth in *Strickland* qualifies as clearly established Federal law, as determined by the Supreme Court of the United States." *Williams,* 529 U.S. at 391, 120 S.Ct. 1495 (internal quotation marks omitted); *Sellan,* 261 F.3d at 309; *see also Eze v. Senkowski,* 321 F.3d 110, 124 (2d Cir. 2003); *Aparicio v. Artuz,* 269 F.3d 78, 95 & n. 8 (2d Cir.2001). *Strickland* established a two-prong test to determine whether counsel has been ineffective. A defendant must prove that: (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 688, 694, 104 S.Ct. 2052; *see Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Aparicio,* 269 F.3d at 95; *see also Clark v. Stinson,* 214 F.3d 315, 321 (2d Cir.2000).

A criminal defendant has a high burden to overcome to prove the deficiency of his counsel.

> To determine whether a counsel's conduct is deficient, "[t]he court must . . . determine whether, in light of all of the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." In gauging the deficiency, the court must be "highly deferential," must "consider[ ] all the circumstances," must make "every effort . . . to eliminate the distorting effects of hindsight," and

> must operate with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ."

*Lindstadt v. Keane,* 239 F.3d 191, 198–99 (2d Cir.2001) (quoting *Strickland,* 466 U.S. at 688–89, 690, 104 S.Ct. 2052) (alterations and omissions in *Lindstadt,* internal citations omitted). As a general rule, a habeas petitioner will be able to demonstrate that trial counsel's decisions were objectively unreasonable only if "there [was] no . . . tactical justification for the course taken." *United States v. Luciano,* 158 F.3d 655, 660 (2d Cir.1998) (*per curiam* ); *see Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (holding that petitioner must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy").

■ As for prejudice resulting from counsel's inadequate performance:

> An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. To merit habeas relief, the defendant must show that the deficient performance prejudiced the defense. The level of prejudice the defendant need demonstrate lies between prejudice that had some conceivable effect and prejudice that more likely than not altered the outcome in the case. Thus [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." The Court defined reasonable probability as one that undermine[s] confidence in the outcome.

*Lindstadt,* 239 F.3d at 204 (alterations in original, internal quotation marks and citations omitted); *see also Aparicio,* 269 F.3d at 95 (citing *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052); *Flores v. Demskie,* 215

F.3d 293, 304 (2d Cir.2000). In making the "reasonable probability" determination:

[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland,* 466 U.S. at 695–96, 104 S.Ct. 2052. Failure to show "either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700, 104 S.Ct. 2052.

Here, Lynn's Sixth Amendment claims revolve around the identification testimony given by Quinones and Patterson. Although these two witnesses, who did not know each other, provided mutually corroborative inculpatory identifications at trial, each had previously told the police that he had not witnessed the shooting or was unable to identify the shooter. The allegations of defense counsel's ineffectiveness went to the cross-examination of Quinones, the failure to demand a second *Wade* hearing, and the inability of counsel to secure the admission of a portion of a police re-port. The Appellate Division's decision rejecting Lynn's Sixth Amendment claims was based on the *Strickland* analysis, and therefore our inquiry is whether the Appellate Division's application of federal law was objectively unreasonable.

A. Counsel's Failure to Seek to Reopen the *Wade* Hearing

"The purpose of a *Wade* hearing is to determine [before] the trial whether pretrial identification procedures have been so improperly suggestive as to taint an incourt identification." *Twitty v. Smith,* 614 F.2d 325, 333 (2d Cir.1979) (citing *Wade,* 388 U.S. at 242, 87 S.Ct. 1926). N.Y.Crim. Proc. § 710.40(4) provides:

If after a pre-trial determination and denial of the motion the court is satisfied, upon a showing by the defendant, that additional pertinent facts have been discovered by the defendant which he could not have discovered with reasonable diligence before the determination of the motion, it may permit him to renew the motion before trial or, if such was not possible owing to the time of the discovery of the alleged new facts, during trial.

■ The Appellate Division held that Lynn was not entitled to relief on this ground because he could not "demonstrate[ ] that he was deprived of effective assistance by counsel's failure to seek a reopened suppression hearing based on the People's disclosure at the start of trial, since [he had] not shown that the hearing would have been reopened, or that a reopened hearing would have resulted in suppression of any evidence." *Lynn,* 251 A.D.2d at 250–51, 673 N.Y.S.2d 913.

Lynn makes two arguments here. First, Lynn claims that the Appellate Division applied reasoning contrary to clearly established federal law because it focused on the result of the *Wade* hearing rather

than on the outcome of the proceeding as a whole. Second, Lynn posits that the Appellate Division's decision was based on an objectively unreasonable application of *Strickland* because Henriksen rendered ineffective assistance by failing to move to reopen the *Wade* hearing after he learned of the first Patterson photo array.

In rejecting the conclusions of the Magistrate Judge, the District Court noted the difficulties in determining why Henriksen did not move to reopen the *Wade* hearing, Henriksen having passed away before the conviction became final. The District Court therefore could not fault Lynn "for not developing the record further on this point." *But see Greiner v. Wells,* 417 F.3d 305, 326 (2d Cir.2005) (A lawyer's "inability to remember his reasons for conducting the trial in the manner that he did ... is insufficient evidence to overcome the presumption of constitutionally effective counsel" where a justification appears on the record. "Without evidence establishing that counsel's strategy arose from the vagaries of ignorance, inattention or ineptitude, *Strickland*'s strong presumption must stand." (internal quotation marks and citations omitted)). Nevertheless, because "the State's entire case hinged on the eyewitness testimony of Patterson and Quinones," the District Court found it "inconceivable that Henriksen did not move to reopen the *Wade* hearing."

Under New York law, the trial court has discretion to reopen a *Wade* hearing if "additional pertinent facts" are discovered that could not have been discovered with reasonable diligence before the *Wade* determination and that go "to the issue of official suggestiveness such that they would materially affect or have affected the earlier *Wade* determination." *People v. Clark,* 88 N.Y.2d 552, 555, 647 N.Y.S.2d 479, 670 N.E.2d 980 (1996). Had the *Wade* hearing been reopened, it would have only been as to Patterson's identification because Quinones did not make two separate identifications. Lynn claims that if Patterson's identification had been ruled inadmissible, Quinones's in-court identification alone would have been such weak evidence so as to undermine confidence in the outcome. This argument assumes, in the absence of any supporting evidence, that Patterson's identification would have been excluded. There is nothing in the Record before us to suggest that, had the *Wade* hearing been reopened, Patterson's identification of Lynn would have been suppressed due to an improper police procedure regarding the out-of-court identification procedure (the first showing of the photo array to Patterson) that rendered the array so improperly suggestive as to taint Patterson's in-court identification. *See Twitty,* 614 F.2d at 333.

Moreover, the purpose of a *Wade* hearing is not to determine whether there are "inconsistent identifications" nor to obtain more fodder for cross-examination. Rather, the purpose of a *Wade* hearing is to examine police procedures surrounding an out-of-court identification of the defendant for a taint of suggestiveness.

In prior habeas cases in which there were claims of ineffective assistance of counsel for failing to request a *Wade* hearing, this Court has demanded some showing of the likelihood for success at the hearing. In *Saltys v. Adams,* 465 F.2d 1023, 1028 (2d Cir.1972), we held that a failure to request a *Wade* hearing constituted ineffective assistance because there had been a highly viable *Wade* argument for suppression on the basis of tainted eyewitness identifications. *Id.* In *United States v. Daniels,* 558 F.2d 122 (2d Cir. 1977), we distinguished *Saltys* on the ground that:

> [U]nlike *Saltys,* appellant has not suggested and we do not find any basis for

questioning *the propriety of the out-of-court identification procedure.* After the government sought to introduce the photographic array from which Ingram selected appellant's photograph, counsel conducted a voir dire in which he attempted to bring out, before the jury, the fact that Ingram had only a short time in which to view Daniels and that this was not an adequate opportunity to observe him. Under the circumstances, we do not think that Daniels was prejudiced by counsel's failure to request a pre-trial suppression hearing on the circumstances underlying the out-of-court identification. The voir dire conducted by counsel was primarily an attempt to impeach Ingram's credibility; as such, we think it was a matter of trial strategy best left to the discretion of trial counsel and the assessment of the trial judge.

558 F.2d at 126 (emphasis added).

Based on the Record before us, we determine that Lynn's Sixth Amendment challenge sounding in claims of ineffective assistance of counsel for the failure of Henriksen to move to reopen the *Wade* hearing must fail. There simply is no evidence in the Record regarding improper police conduct pertaining to the out-of-court identification procedures—only "inconsistent statements" resulting from the two photo arrays shown to Patterson. An inquiry into inconsistent statements regarding identifications is a task for trial counsel on cross-examination of the identifying witnesses, and Henriksen did conduct cross-examination to establish that Patterson previously had indicated to police that he did not witness the shooting. We conclude that the state courts' determination—that Lynn was not deprived of effective assistance of counsel by Henriksen's failure to move to reopen the *Wade* hearing—was not objectively unreasonable.

**B. Failure to Cross–Examine Quinones About Earlier Statements to the Police**

Quinones told police in February of 2002 that he was unable to identify the shooter. At the *Wade* hearing, Detective Martinez was asked: "[D]id Quinones tell you at that time that he couldn't make an I.D.?" Detective Martinez responded that "I believe his exact words [were] that he couldn't recognize the person." At trial, Quinones testified that he did not want to get involved at first because he was afraid for himself and his family. Lynn contends that Henriksen was ineffective because: (1) he failed to cross-examine Quinones about the fact that he originally told the police that he was unable to identify the shooter, and (2) he failed to argue this point to the jury.

The State argued that it was a strategic decision by Henriksen to forego this line of questioning because, if Quinones had been confronted with his statement while being cross-examined, Quinones would have simply testified that at the time he had spoken to the police, he was still concerned about his safety and the safety of his family. The District Court, however, reasoned that Quinones' credibility was central to the defense's case, and Henriksen's failure to cross-examine Quinones about his prior February statement to the police rendered his representation ineffective:

[I]f Henriksen had elicited an admission from Quinones that he told Detective Martinez on February 20 that he was unable to identify the shooter ... the jury ... would have heard testimony about a second occasion on which Quinones spoke with the police, failed to implicate petitioner, and told the police that he was incapable of making an identification of the shooter. This fact, which was otherwise not presented to

the jury at trial, would have impeached Quinones's subsequent identification, with little or no risk to petitioner's defense.

If Quinones were to have *denied* making such a statement to Detective Martinez on February 20, the jury would have had an additional basis on which to question Quinones's credibility.... Because Quinones's lack of credibility was central to the defense, Henriksen's failure to attempt to impeach Quinones with this line of questioning fell below the objective standard of reasonableness.

The totality of the record does not support this conclusion. Although Henriksen did not specifically question Quinones about his initial statement to police regarding his inability to identify the shooter, he did question Quinones about his statement to the police that he "didn't know anything about it." Moreover, Henriksen focused his questions on Quinones' relationship with Mark Falu, the friend to whom he had supposedly revealed Arriaga's innocence. Raising questions about Falu was a sound trial strategy. Falu was a mutual friend of Quinones and Arriaga. Falu's brother Steven was arrested along with Arriaga. Moreover, the jury was aware that Quinones had changed his story several times and that he had lied to the police when he said he didn't know anything about the shooting. Thus, Henriksen's line of cross-examination was designed to attack the credibility of Quinones and to demonstrate to the jury that Quinones falsely implicated Lynn in order to protect his friends. This is precisely the sort of cross-examination that the District Court believed was crucial but absent in this case.

Further, it cannot be held that Henriksen's failure to specifically cross-examine Quinones about his February 2002 statement prejudiced Lynn. Henriksen's failure to recite Quinones' statement to the police and to specifically cross-examine Quinones about this statement did not affect the outcome of the trial, for largely the same reasons given above; namely, that Henriksen did cross-examine Quinones regarding his prior inconsistent statements and his motivation to lie to protect his friends. Quinones acknowledged that he had lied to the police when he stated that he knew nothing about the shooting. Moreover, both Patterson and Quinones independently identified Lynn in the photo array and subsequent lineup. The jury in this case simply was not persuaded that Quinones incorrectly identified Lynn as the shooter.

In view of the foregoing, the Appellate Division's decision, that Henriksen "vigorously cross-examined the People's witnesses[ ] and delivered a cogent summation," *see Lynn*, 251 A.D.2d at 250, 673 N.Y.S.2d 913, and therefore that he had been effective, cannot be said to be objectively unreasonable.

C. Failure to Introduce Into Evidence Portions of Detective Beers' Police Report

■ Lynn contends that Henriksen should have sought to have admitted into evidence the portion of the follow-up report (the "Report") of Detective Beers that reflected the detective's observation that, at the time of Arriaga's arrest, Beers had to pull Arriaga out from under a car because a crowd was assaulting him. When Henrikson initially sought to offer the entire Report into evidence, the trial court precluded its admission *in toto* because it contained statements, deemed to be hearsay, made by various witnesses who were under no duty to report to the police. Lynn does not contest that statements referred to in the Report made to the police by other witnesses do not fit the business records exception to the hearsay rule.

Lynn claimed, however, that the portions of the Report that simply reflected what Detective Beers witnessed—i.e., that Arriaga was under a car and being assaulted by a crowd—were admissible under the business records exception because Detective Beers, as a police officer, did have a duty to so report.

Under New York law, a police report is admissible as proof of the facts contained therein, pursuant to N.Y. C.P.L.R. § 4518(a), if " '(1) the entrant of those facts was the witness, or (2) the person giving the entrant the information was under a business duty to relate the facts to the entrant.' " *Donohue v. Losito*, 141 A.D.2d 691, 692, 529 N.Y.S.2d 813 (2d Dep't 1988) (quoting *Toll v. State of New York*, 32 A.D.2d 47, 49, 299 N.Y.S.2d 589 (3d Dep't 1969)); *Stevens v. Kirby*, 86 A.D.2d 391, 395, 450 N.Y.S.2d 607 (4th Dep't 1982); *see also Perfetto v. Hoke*, 898 F.Supp. 105, 114 (E.D.N.Y.1995) (explaining that although police reports may be introduced into evidence pursuant to § 4518(a), "they must be excluded if the recording officer did not observe the matter personally and the declarant did not have a duty to make the statement to the recording officer"). Thus, to the extent Detective Beers' Report recorded his personal observations, it was not inadmissible hearsay. *See. e.g., People v. Fisher*, 201 A.D.2d 193, 198, 615 N.Y.S.2d 374 (1st Dep't 1994).

With respect to the admission of the Report, the State argued that the jury already knew of Arriaga's initial arrest and that "[c]ommon sense dictates that someone had to have identified him as the shooter." The State contended that, had Henriksen pressed the argument that Arriaga was the shooter, as opposed to the uncontested fact that he was arrested, the State would have been permitted "rebuttal evidence that clearly would have shown why Arriaga was no longer" suspected.

The Magistrate Judge took the position that Henriksen was not ineffective in his counsel because there were potentially sound strategic reasons not to introduce the Report:

> There may have been strategic reasons why counsel chose not to press this point. The jury was already aware that Arriaga had been arrested for the shootings in issue and that the case against him had been presented to a grand jury. Defense counsel argued in his summation that the reason why neither Seippio nor Arriaga were present at the trial is that the prosecutor might have been afraid that Seippio would identify Arriaga as the shooter. Had defense counsel pursued the circumstances under which Arriaga was arrested, it might have invited additional testimony as to why the charges against Arriaga had been dismissed. It was to Petitioner's advantage for that issue to have been kept vague.

The District Court disagreed with the Magistrate Judge's view of Henriksen's failure to have received into evidence the portions of Detective Beers' Report documenting his own personal observations, finding that "the record reflects that Henriksen's failure to argue for the admissibility of the portion of Detective Beers' Report containing the detective's own personal observations resulted from Henriksen's lack of understanding of the relevant evidentiary rules." Alternatively, the District Court found that, if it was trial strategy to fail to press this issue, that it was unsound.

The District Court was correct in finding that the failure to introduce the Report was not strategic, as it is clear that Henriksen wanted to have the Report admitted and simply was unable to persuade the

trial judge to receive the Report or any portion of it. Although it is true that Henriksen admitted to a "confused understanding" of the business records exception to the hearsay rule, that self-effacing statement is belied by the fact that he did advance a proper theory for the admissibility of portions of the Report, i.e., that the police officers themselves were "the declarants of what they observed[,] what they have done[,] ... and it is their business to do such things." However, the trial court may have considered that the crowd intended by its actions to point out Arriaga as the shooter. A finding of such intention would require the exclusion of the crowd's conduct as non-verbal hearsay in any event. *See People v. Caviness*, 38 N.Y.2d 227, 230, 379 N.Y.S.2d 695, 342 N.E.2d 496 (1975); 2 John William Strong et al., *McCormick on Evidence* § 250, at 107 (4th ed.1992).

Moreover, any alleged deficiency in Henriksen's failure to have portions of the Report received into evidence did not prejudice Lynn. The District Court believed that the information contained in the Report that was not otherwise before the jury—that Arriaga was hiding underneath a car a few blocks from the scene while being assaulted by a crowd—would have created reasonable doubt of Lynn's guilt. The District Court was of the opinion that counsel's failure in this respect, combined with the other omissions of counsel, was prejudicial to Lynn and "seriously undermine[d]" confidence in the outcome reached at trial. The Magistrate Judge aptly pointed out, however, that

> even if the police report had been admitted in evidence, it would have added little to [Lynn's] defense. The jurors were already aware that Arriaga had originally been arrested for the shooting. That he was pulled out from underneath a car, or that a crowd had

assaulted him, was of no material significance.

Given the Record before us, we are unable to hold that the state court's determination, that the failure of counsel to successfully have argued for admission of portions of the Report rendered counsel's assistance ineffective, was objectively unreasonable.

## CONCLUSION

Based on the foregoing, the state appellate court's determination was not an unreasonable application of federal law. Accordingly, the judgment of the District Court is reversed, and the petition for a writ of habeas corpus is dismissed with prejudice.